IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JENNIFER LAVERTY,** | **CIVIL ACTION** |
| Plaintiff, | |
| v. | |
| **DREXEL UNIVERSITY,** | **NO. 14-5511** |
| Defendant. | |

**MEMORANDUM OPINION**

Plaintiff Jennifer Laverty brings this action against her former employer, Defendant Drexel University ("Drexel") under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. § 951 *et seq*. Plaintiff claims that her employment with Defendant was terminated based upon her sex and pregnancy. Defendant seeks summary judgment in its favor on both claims. For the reasons set forth herein, Defendant's motion for summary judgment shall be granted.

I. **BACKGROUND**

A. **Plaintiff's Job Function**

On January 3, 2013, Plaintiff was hired by Defendant as a Bursar Specialist, Student Receivables ("Bursar SRS"), effective January 7, 2013. J.A. 47-48. This role, which was situated within Defendant's Office of the Bursar ("Bursar"), was to provide direct customer service to Drexel students regarding their billing inquiries. J.A. 36-46. Bursar SRSs' day-to-day tasks entailed (a) responding to student e-mail inquiries through Drexel's online platform, ask.drexel.edu ("Ask Drexel"); (b) responding to student questions via telephone ("call-back");

1

and (c) providing in-person customer service to students with billing questions ("walk-ins"). J.A. 215. The job description for Plaintiff's position indicated a preference for "[s]trong communication (oral and written), organizational, interpersonal, accounting and analytical skills." J.A. 36.

In January 2013, shortly after Plaintiff was hired, Defendant announced that it would be centralizing student customer service concerning billing, financial aid, and registration into a single "one-stop" entity named Drexel Central. J.A. 467. As Drexel Central would replace the customer service offered by the Bursar, all Bursar SRS positions were scheduled to be phased out on June 30, 2013. J.A. 468. All existing Student Services Receivables Specialists in the affected departments, including the Bursar, were invited to apply for positions with Drexel Central. J.A. 468. The hiring process for Drexel Central was conducted outside of the purview of the Bursar. J.A. 291. Plaintiff applied for a position with Drexel Central, and was offered a position as a Drexel Central Student Services Representative in Student Financial and Registration Services ("SFRS"), effective July 1, 2013, pending "(a) [c]ontinued good solid performance between the acceptance date of the offer and July 1, 2013" and (b) "[s]uccessful completion of the initial SFRS training program." J.A. 78.

While continuing to serve as a Bursar SRS, Plaintiff began a four-month SFRS training program on February 23, 2013. J.A. 468. Other than being allowed designated times to attend training sessions, the Drexel Central SFRS training was separate from each trainees' existing position, and all trainees—including Plaintiff—were expected to continue performing their existing job duties. J.A. 249, 298, 362.

Plaintiff was terminated from her position with the Bursar on May 9, 2013. J.A. 101. Accordingly, she was no longer employed by Defendant when Drexel Central was implemented, and she never worked as a Drexel Central Student Services Representative.

### B. Plaintiff's Work History

Plaintiff's entire four-month tenure as a Bursar SRS occurred as a probationary employee. After the conclusion of her initial 90-day probationary period, Plaintiff's direct supervisor, Manager of the Bursar Megan Smith ("Smith") extended Plaintiff's probationary period for an additional 30 days due to performance concerns. J.A. 384. Prior to the completion of the extended probationary period, during which Plaintiff was primarily supervised by Assistant Director of the Bursar Ann Fulton ("Fulton"), Plaintiff's employment with Defendant was terminated.

Throughout Plaintiff's employment, the other Bursar SRSs were Jennifer Magauran ("Magauran") (female), Gary LaNoce ("LaNoce") (male), and Kayla Tygh ("Tygh") (female). J.A. 464. All three were hired prior to Plaintiff's tenure with Defendant, and all three remained in their positions after Plaintiff's termination. *Id.* At the beginning of Plaintiff's employment, Smith, Fulton, and the Bursar SRSs all worked on the same floor of the same building at 33rd and Chestnut Streets on Drexel's main campus in Philadelphia. J.A. 285. In mid-February, Smith, Plaintiff, and the other Bursar SRSs moved to another floor in the same building, while Fulton moved to another building located at 32nd and Market Streets. J.A. 294-95.

#### 1. Initial 90-Day Probationary Period

During the first two weeks of her employment with Defendant, Plaintiff's primary task consisted of directing students to the appropriate offices within the Bursar's office. J.A. 229. Also during January 2013, Plaintiff attended a general orientation, as well as training concerning

3

the Ask Drexel and Banner online platforms that she would be expected to use in her role as a Bursar SRS.  J.A. 230, 465.

In late January 2013, Plaintiff began shadowing LaNoce to gain a familiarity with the day-to-day tasks of a Bursar SRS.  J.A. 229.  In February 2013, Plaintiff shadowed Smith several times, and also began to shadow Magauran and Tygh.  J.A. 230, 233.  In mid-February 2013, Plaintiff began drafting e-mail responses to a limited number of Ask Drexel inquiries, which were temporarily saved for review by Fulton or Smith.  J.A. 306, 376-77.  At her deposition, Smith testified that she had concerns that Plaintiff's draft responses demonstrated an inability to comprehend the student inquiry, were poorly written, and sometimes provided inaccurate information.  J.A. 377-78.  Between February 26 and March 4, 2013, Smith sent Plaintiff several written training documents via e-mail, including materials on financial aid, abbreviations, billing, tuition deferment, student leaves of absence, and desktop procedures within the computer platform used by the Bursar.  J.A. 69-70, 71-73, 465.  On March 15, 2013, Smith sent Plaintiff an e-mail with specific areas of improvement for crafting her written responses, including an admonition to include sufficient context to frame the response, "to be careful not to respond as if we are AIM'ing or texting," noting that "[a]bbreviations/[a]cronyms are okay if you use the full word first," and to "[a]void using contractions."  J.A. 92.

Beginning in March 2013, Fulton joined Smith in providing written feedback to Plaintiff concerning areas for improvement in her written communication.  For example, on March 26, 2013, Fulton advised Plaintiff in an e-mail that Plaintiff's response to an Ask Drexel inquiry "will need to be more specific.'"  J.A. 118.  The next day, Fulton informed Plaintiff that one of her draft Ask Drexel responses "does not address [the student's] questions."  J.A. 118-19.

As a result of Plaintiff's continued difficulties with job performance, Smith determined that it was necessary to present Plaintiff with a Performance Improvement Plan ("PIP") near the end of the initial probationary period.  J.A. 301.  She conferred with Fulton before issuing the PIP, and Fulton reviewed the contents of the PIP document before it was presented to Plaintiff.  J.A. 306.   Smith met with Plaintiff and presented her with the PIP on April 8, 2013.  J.A. 93-94.  The PIP indicated that Plaintiff was receiving a Written Warning and formally informed Plaintiff that:

> There is an immediate need for you to improve your overall job performance.
> Your written responses to student/parent inquiries have been unprofessional and your overall work performance needs to be elevated to the appropriate standards of your job role.  You have not been consistent and thorough in your research to customers [sic] inquiries, which causes your responses to not resolve the issue.
> Your productivity when it comes to completing your daily job duties is not at a satisfactory level.  Failure to address these concerns and to demonstrate sustained improvement will result in further action, up to and including termination.

*Id.*  In the PIP, Smith also wrote that:

> We met in my office on numerous occasions and went over how to appropriately respond to student inquiries.  I also sent you an email on Friday, March 15, 2013, going into detail on how to professionally respond to inquires [sic].
> We have also discussed in my office more than once that if you are sitting with a student/parent for longer than 10-15 minutes and still are unsure of the issue you are to contact myself or another manager.  You cannot have a student/parent sit with you for an hour or more and still not be able to answer their questions.  I have instructed that if myself or another manager is not available, you will need to take the student/parent contact information and follow-up with them at a later time.

*Id.*  The PIP imposed expectations that Plaintiff "fully research and accurately respond to customers [sic] questions in a professional manner," and to "contact [Smith] or another manager if you are unable to understand a walk-in student/parent issue within 10-15 minutes of meeting with them." *Id.*  The goals were to be achieved "[i]mmediately and sustained." *Id.*  In the

5

Employee's Comments section of the PIP, Plaintiff indicated that "I do agree I need improvement . . . I will be more conscientious when drafting emails and time spent with walk ins." J.A. 95.

In addition to implementing a PIP, Smith informed Plaintiff that her probationary period would be extended for 30 days. J.A. 261. Fulton agreed with the decision to extend Plaintiff's probationary period, and Smith cleared the decision with Human Resources Partner Shannon Camps ("Camps") on April 10, 2013. J.A. 374, 384, 485-86.

### 2. Extended Probationary Period

After the implementation of Plaintiff's PIP and the extension of her probationary period, Fulton increased the frequency with which she offered Plaintiff e-mail feedback concerning her responses to questions submitted through Ask Drexel. J.A. 118-67. Fulton's e-mails included frequent requests for Plaintiff to further clarify her student responses, as well as general feedback for improvement in Plaintiff's use of the Ask Drexel computer platform. *Id.*

On April 12, 2013, Plaintiff informed a small group of her co-workers, including Magauran and Tygh, that she was pregnant. J.A. 197, 205, 539, 555. Neither Fulton nor Smith were present when Plaintiff initially shared the news of her pregnancy with her co-workers. Both Magauran and Tygh testified as deposition that they were surprised to learn of Plaintiff's pregnancy. J.A. 539, 555. Later that day, Plaintiff first informed Fulton of her pregnancy in a private meeting. J.A. 197. Plaintiff informed Smith of her pregnancy the following week. J.A. 197.

In the same meeting on April 12, 2013 at which Plaintiff informed Fulton of her pregnancy, Fulton informed Plaintiff that Fulton would be immediately assuming Smith's day-to-day supervisory duties for all Bursar SRSs. J.A. 199. Fulton and Smith had agreed that

6

relieving Smith of managerial duties would be beneficial to allow Smith to focus on her own completion of SFRS training in preparation for her transition to a non-managerial position with Drexel Central.[1]

After assuming day-to-day management responsibilities over Bursar SRSs, Fulton continued to provide Plaintiff with frequent written feedback concerning her Ask Drexel responses.  J.A. 131-67.  Throughout these e-mails, Fulton repeatedly identified instances in which Plaintiff's responses either failed to clearly answer a student's question or provided incorrect information regarding the student's billing situation.  *Id.*

On April 29, 2013, Plaintiff received a comprehensive evaluation of her progress in the SFRS training from Drexel's Director of Communications and Training, Nicholas Perez ("Perez").  J.A. 90-91.  In the evaluation, Perez indicated that Plaintiff's performance and attendance were generally satisfactory, but cautioned Plaintiff that:

> Your test answers at times can be short and occasionally your answers do not fully demonstrate you understand the full grasp of the material being presented. . . . [A]t times the intent of your answer is difficult to understand.  It is recommended that you fully read each response and avoid abbreviations and correct any typing issues before submitting your test.

J.A. 91.

On April 30, 2013, Fulton wrote to Camps that Plaintiff's "performance has not improved and I would at this point like to terminate her employment.  Please review and advise next steps."  J.A. 97.  Attached to Fulton's e-mail was a screenshot of one of Plaintiff's draft Ask Drexel responses that, in Fulton's assessment, "had nothing to with what the student had asked."  J.A. 313.  In response, Camps requested documentation concerning Plaintiff's performance after

---

[1] Smith's position with the Bursar was eliminated as part of the transition to Drexel Central.  J.A. 366.  Smith was offered a non-managerial position as a Senior Student Services Representative with Drexel Central in mid-February 2013, which job she started on July 1, 2013.  J.A. 364-65.  Fulton's position was not eliminated in the transition to Drexel Central, and she remained employed in in the Bursar's office after July 1, 2013.  J.A. 293.

the implementation of the PIP on April 8, 2013. *Id.* Fulton responded via e-mail on May 1, 2013, that (1) Plaintiff had missed Drexel Central training on April 26, 2013; (2) Plaintiff's responses to Ask Drexel questions continued to be both unclear and inaccurate; (3) Plaintiff allowed Ask Drexel inquiries to remain in the queue too long before responding; (4) Plaintiff continued to have difficulty efficiently completing her assigned tasks, leading Fulton to respond herself to Ask Drexels assigned to Plaintiff; and (5) on April 29, 2013, and April 30, 2013, Plaintiff spent more than 30 minutes with a student unsuccessfully attempting to resolve walk-in questions. *Id.* Fulton did not indicate in her e-mail that Plaintiff was pregnant, and Camps testified that she was not aware of Plaintiff's pregnancy at that time. J.A. 429.

Plaintiff was informed of her termination in a meeting on May 9, 2013 with Fulton, Smith, and Camps. In the Personnel Action Form reflecting her termination, the basis for termination is listed as "UP," indicating "unsatisfactory performance." J.A. 101, 457.

### 3. Plaintiff's Pregnancy

Plaintiff learned that she was pregnant on February 14, 2013. J.A. 202. By mid-March, when Plaintiff was eight weeks pregnant, Plaintiff claims that she was having migraines at work, was nauseous, was experiencing morning sickness, was drinking more water, was taking additional bathroom breaks, was eating a healthier diet, switched to flat shoes from heels, and brought a lamp to work to alleviate her migraines and nausea. J.A. 107, 192, 205. Additionally, Plaintiff testified that she began wearing maternity clothes in "late March" 2013. J.A. 185-86.

On March 14, 2013, Plaintiff sent an e-mail to Smith requesting time off to attend a doctor's appointment the following week. J.A. 497. The e-mail did not indicate the reason for the appointment, and Smith testified that she never discussed the reason with Plaintiff. J.A. 383.

Plaintiff testified that Smith approved the leave and did not make any negative comments about the request. J.A. 185-86.

There is no evidence in the record that Plaintiff's supervisors or Bursar SRS colleagues noticed the outward signs of pregnancy that Plaintiff described in her deposition. Both Fulton and Smith specifically denied noticing changes in Plaintiff's appearance or having any knowledge of her pregnancy prior to Plaintiff's announcement on April 12, 2013. J.A. 300, 389. Tygh and Magauran likewise testified that they were surprised to learn of Plaintiff's pregnancy, J.A. 539, 555, and Magauran indicated that there had not been any conversations in the office regarding speculation that Plaintiff was pregnant prior to Plaintiff's own announcement. J.A. 555.

## II.     LEGAL STANDARD

"[S]ummary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (citations and internal quotation marks omitted). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52). A fact is material if it might affect the outcome of the suit under the governing law. *Scheidemantle v. Slippery Rock Univ. State*

9

*Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006). "The reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). However, to prevail on a motion for summary judgment, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].'" *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007) (quoting *Anderson*, 477 U.S. at 252) (alteration in *Jakimas*). In other words, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Abington Friends Sch.*, 480 F.3d at 256 (citing *Celotex*, 477 U.S. at 322-26).

### III. DISCUSSION

Plaintiff has asserted claims under both Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and the Pennsylvania Human Rights Act (PHRA), 43 Pa. Stat. § 951 *et seq.*, alleging discrimination on the basis of sex and pregnancy status. The Third Circuit has held that the PHRA is coextensive with Title VII. *See Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996). Accordingly, Plaintiff's claims under both laws will be analyzed together.

Title VII prohibits discrimination based on an employee's sex. This prohibition extends both to cases where the motivating factor behind an employer's decision is motivated by the employee's sex alone, and also when "an employee's pregnancy or related medical condition is a motivating factor for the employer's adverse employment decision." *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008) (internal quotations marks and modifications omitted). Both sex- and pregnancy-related discrimination claims are analyzed under the three-step burden-shifting framework articulated in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). *See*

*C.A.R.S. Prot. Plus*, 527 F.3d at 364 (applying *McDonnell Douglas* framework to pregnancy discrimination claims); *Scheidemantle*, 470 F.3d at 539 (applying *McDonnell Douglas* framework to sex discrimination claims).

Under the *McDonnell Douglas* analysis, a plaintiff must first make out a *prima facie* case of discrimination. *Scheidemantle*, 470 F.3d at 539. If a *prima facie* case is established, the burden shifts to the employer to establish a legitimate nondiscriminatory reason for its adverse employment action. *Id.* If the employer puts forth such a basis, the plaintiff's claim can succeed only if she can show that the proffered nondiscriminatory reason is merely a pretext for discrimination. *Id.* The elements of a *prima facie* case of pregnancy discrimination and sex discrimination are slightly different and shall be discussed separately below.

### A. *Pregnancy Discrimination*

#### 1. *Prima Facie* Case

To make out a *prima facie* case of pregnancy discrimination, a plaintiff must show that: (1) she was pregnant and that her employer knew of the pregnancy; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) there is a nexus between her pregnancy and the adverse employment action. *C.A.R.S. Prot. Plus*, 527 F.3d at 365. With respect to the first element, the Third Circuit has emphasized that "if the pregnancy is not apparent and the employee has not disclosed it to her employer, she must allege knowledge and present, as part of her *prima facie* case, evidence from which a rational jury could infer that the employer knew that she was pregnant." *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996). Turning to the second element, an employer's promotion of an employee to a given position constitutes *prima facie* evidence that the employee was qualified. *See Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 268 (3d Cir. 2005). This principle has also been

11

applied to the initial hiring decision.  *See Nunn v. NHS Human Servs., Inc.*, No. 13-cv-3140, 2015 WL 3604164, at *8 (E.D. Pa. June 9, 2015) ("[P]laintiff has demonstrated that she was sufficiently qualified . . . based on the fact that defendant chose to interview her and selected her as a finalist for the position.") (citing *Hugh*, 418 F.3d at 268).  Given the light burden to make out a *prima facie* case, subjective disputes over an employee's qualifications are generally best left to the second and third stages of the *McDonnell Douglas* analysis.  *See Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 523 (3d Cir. 1993).  With respect to the third element, an adverse action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."  *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004).  Finally, a nexus between protected status and an adverse action may be shown at the *prima facie* stage through temporal proximity if timing of the adverse action and the employer's initial knowledge of the protected status is "unusually suggestive" of a causal connection.  *Marra v. Phila. Housing Auth.*, 497 F.3d 286, 302 (3d Cir. 2007).

Here, Plaintiff disclosed her pregnancy to her employer on April 12, 2013.  Fulton made the decision to terminate Plaintiff 18 days later on April 30, 2013.  Plaintiff argues that there is a temporal proximity between her termination and the disclosure of her pregnancy that warrants the conclusion that there is a nexus between the termination and her pregnancy.  Although the Third Circuit has declined to set forth a bright-line rule concerning the timing necessary to demonstrate "unusual suggestiveness" of discrimination, an 18-day gap between announcement of pregnancy and termination could, as a general matter, give rise to an inference of discrimination.  Plaintiff's hiring by Defendant is sufficient to show that Plaintiff was qualified, for the purposes of her *prima facie* case, and termination is an adverse action.  Leaving disputes

over the Plaintiff's actual job performance to be resolved in the second and third steps of the *McDonnell Douglas* analysis, the Court finds that Plaintiff has made out a *prima facie* case of pregnancy discrimination with respect to her termination on May 9, 2013.

Plaintiff contends that the extension of her probationary period, the implementation of her PIP, and Smith and Fulton's written criticism of her job performance beginning on March 15, 2013 also constitute discrimination. As a preliminary matter, only the PIP and the extension of Plaintiff's probation period are sufficiently "serious and tangible" modifications to the terms of Plaintiff's employment to constitute adverse actions under the circumstances here and Plaintiff's theory of liability. In support of her argument that Defendant's alleged discrimination began prior to April 12, 2013, Plaintiff argues that Smith became aware of her pregnancy on March 14, 2013, when Plaintiff sent an e-mail requesting time off to attend a doctor's appointment the following week. At the time, Plaintiff was eight weeks pregnant, but had not informed any of her co-workers or supervisors. Plaintiff argues that she had begun to "show" her pregnancy by that time, and had also begun to exhibit several other observable signs of pregnancy. However, evidence of these outward manifestations of pregnancy consists only of Plaintiff's testimony that she felt these changes herself and believed that others must have noticed them. Plaintiff has not pointed to any examples of co-workers, let alone her supervisors, indicating that they noticed any changes in Plaintiff's behavior or appearance other than Plaintiff's own testimony that a receptionist named Lori mentioned, in response to Plaintiff's pregnancy announcement on April 12, 2013, that she "thought [Plaintiff] could have been pregnant." J.A. 197. By contrast, Fulton, Smith, Tygh, and Magauran all testified at deposition that they were unaware that Plaintiff was pregnant until she told them directly. Furthermore, at Plaintiff's deposition, when asked when she started "showing," Plaintiff responded, "I would say I started wearing pregnancy clothes the

end of March, late March, end of March." J.A. 205.  Plaintiff offered no further or more specific testimony concerning the timing of her pregnancy beginning to show.  J.A. 205.  Thus, not only is there no evidence that co-workers or supervisors noticed Plaintiff's pregnancy-related health and behavior changes, Plaintiff's own testimony undermines her argument that she was visibly pregnant when she requested a doctor's appointment on March 14, 2013—only half way through March.

In sum, taking all inferences in favor of the Plaintiff, the record shows only that Plaintiff herself felt changes to her appearance and made changes to her behavior.  Since Plaintiff has failed to offer any evidence that, if true, would support an inference that Plaintiff's supervisors noticed the changes in her appearance and behavior, let alone that they concluded from such changes that Plaintiff was pregnant, it would not be reasonable for a factfinder to infer that Plaintiff's supervisors knew that she was pregnant prior to April 12, 2013.  Accordingly, while Plaintiff has made out a *prima facie* case of pregnancy discrimination with respect to her termination on May 9, 2013, she has failed to make out a *prima facie* case of discrimination with respect to the extension of her probationary period or the implementation of her PIP.

### 2. Legitimate Non-Discriminatory Basis for Termination

Defendant has proffered that Plaintiff was terminated due to unsatisfactory performance of her customer service responsibilities as a Bursar SRS.  Specifically, Defendant asserts that Plaintiff was fired after both Smith and Fulton concluded that Plaintiff was unable to effectively answer e-mail and in-person billing questions from students and parents.  Defendants have submitted written documentation of this concern about Plaintiff's performance dating to at least March 15, 2013—only three days after she assumed her full customer service responsibilities,

three weeks before any adverse actions (*i.e.*, the extension of her probationary period and the implementation of a PIP), and four weeks before Plaintiff announced her pregnancy.

### 3. Pretext

To defeat summary judgment when the defendant has responded with a legitimate, non-discriminatory reason for its action, the plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

When a plaintiff offers no affirmative evidence of discrimination but instead relies entirely on demonstrating the weakness of an employer's proffered reasons to show pretext, "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Id.* (internal citations omitted). The inquiry is not whether the employer was "wise, shrewd, prudent, or competent," but rather whether the proffered reasons are so implausible that a factfinder could rationally believe that they were not, in fact, the true reasons for the employer's action. *Id.* Accordingly, it is not enough for a plaintiff to "simply show that the employer's decision was wrong or mistaken," but instead the "plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its act that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* at 765. (internal quotation marks and citations omitted).

Plaintiff makes several arguments to challenge Defendant's proffered basis for her termination. First, she argues that Defendant, in particular Smith or Fulton, knew that she was pregnant as early as March 15, 2013, and thus began to create a record of performance concerns from that date forward as pretext for Plaintiff's termination. Second, she alleges that Defendant did not follow its own policies concerning unsatisfactory performance and termination in Plaintiff's case. Third, she cites Plaintiff's satisfactory performance in SFRS training as evidence contradicting Defendant's assessment of Plaintiff's job performance.

Plaintiff's argument that Smith or Fulton knew of her pregnancy prior to April 12, 2013 rests entirely on her claim that the physical manifestations of the first two months of her pregnancy—including weight gain, a healthier diet, migraines, nausea, increased use of bathroom, and wearing flat shoes instead of heels—led Smith to infer that Plaintiff was pregnant when she requested time off to visit a doctor on March 14, 2013. However, for the same reasons that Plaintiff is unable to make out a *prima facie* case of pregnancy discrimination for actions prior to April 12, 2013, she has failed to produce evidence from which a factfinder could reasonably infer that Fulton or Smith knew that Plaintiff was pregnant prior to Plaintiff's own announcement. It would be purely speculative for a factfinder to conclude that Plaintiff's supervisors inferred that she was pregnant when she requested time to visit a doctor on March 14, 2013.

The various violations of Defendant's Human Resources policies that Plaintiff has alleged, even if true and even if technically inconsistent with Defendant's policies, fall short of giving rise to the inference that Defendant's proffered nondiscriminatory reason is pretextual. As a preliminary matter, any procedural irregularities prior to April 12, 2013—including the implementation of the PIP and the extension of Plaintiff's probationary period—cannot give rise

16

to an inference of pretext because Plaintiff has not submitted evidence that Fulton or Smith knew of Plaintiff's pregnancy prior to that date.  With respect to actions taken after April 12, 2013, the procedural irregularities identified by Plaintiff are noteworthy but do not demonstrate inconsistencies or contradictions that would undermine Defendant's consistent documentation of Plaintiff's unsatisfactory performance.  More specifically, even if Plaintiff is correct that Defendant failed to enter Plaintiff's extended probationary performance goals in the appropriate online form, these goals were clearly set forth in the PIP, which Plaintiff admits to receiving in a meeting with Smith.  Even if, as Plaintiff contends, Fulton did not meet with Plaintiff in person regularly during the extended probationary period, there is no dispute that Fulton made consistent efforts to provide guidance to Plaintiff through extensive written feedback.  Even if Fulton did not inform Camps about Plaintiff's pregnancy in the process of recommending her termination, a supervisor's decision *not* to mention a protected status in a recommendation to terminate does not warrant the inference that discrimination was the true basis for the decision, at least absent some evidence of an effort to conceal discriminatory motivation.  Finally, even if Defendant's failure to seek a termination PIP from Fulton was a violation of Defendant's policies, this omission occurred after the decision to terminate Plaintiff had already been made.  Documentation of the reasons for Plaintiff's termination had already been submitted to Human Resources for approval in Fulton's May 1, 2013 e-mail to Camps.  In short, even if Plaintiff is right that each of these oversights occurred and that each was a technical violation of Defendant's policies, this would not show such "implausibilities, inconsistencies, incoherencies, or contradictions" as to reasonably suggest that Defendant's proffered reason was not the genuine basis for Plaintiff's termination.

In an effort to challenge Defendant's proffered assessment of Plaintiff's job performance, Plaintiff emphasizes her performance in Drexel Central SFRS training. This argument is unavailing for several reasons. First, performance in SFRS training was not part of Plaintiff's performance evaluation with the Bursar. Second, SFRS training performance was based entirely on classroom assessments of knowledge and not on the performance of customer service functions implicated in Plaintiff's job with the Bursar. Furthermore, while Plaintiff's overall performance at SFRS training was satisfactory, she was given specific feedback regarding improvement of her written responses—precisely the area of her unsatisfactory performance with the Bursar. Thus, not only is satisfactory progress in SFRS training a separate issue from job performance with the Bursar, to the extent that SFRS training evaluations provide evidence of Plaintiff's written communications skills, the evaluations cite similar weaknesses to those Fulton cited as basis for Plaintiff's termination.

In addition to a failure to provide evidence to undermine Defendant's proffered basis for her termination, Plaintiff's general theory of pretext is inconsistent with the record. Plaintiff suggests that Fulton and Smith sought to terminate Plaintiff out of concern that she would be absent from work due to maternity leave. However, after Plaintiff's scheduled transition to Drexel Central on July 1, 2013, neither Fulton nor Smith would have been Plaintiff's supervisor. Smith's scheduled position with Drexel Central was not managerial, and Fulton remained in the Bursar's office. Thus, the only two individuals Plaintiff has alleged to have discriminated against her would not have been the managers impacted by Plaintiff's maternity leave.

In sum, Defendant proffers that Plaintiff was terminated for unsatisfactory performance in her customer service role as a Bursar SRS and has put forth evidence of an extensive record of concerns with Plaintiff's job performance, dating from three days after Plaintiff first began

responding to a full caseload of e-mail and walk-in billing inquiries—nearly a month before Plaintiff informed her co-workers and supervisors that she was pregnant. Defendant's documentation is substantively consistent with the proffered reason for termination. Even resolving all disputed facts in Plaintiff's favor, Plaintiff has failed to identify such irregularities or inconsistencies that would allow a reasonable inference that the proffered nondiscriminatory reason is pretextual. Accordingly, Defendant's motion for summary judgment dismissing Plaintiff's pregnancy discriminatory claims shall be granted.

### B.  *Sex Discrimination*

To make out a *prima facie* case of sex discrimination under Title VII and the analogous provision of the PHRA, a plaintiff "must show that: (1) she was a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) members of the opposite sex were treated more favorably." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).

Here, Plaintiff has failed to provide any evidence that Drexel treated male employees more favorably than it treated Plaintiff. Other than noting that one of Plaintiff's co-workers was male, the record lacks any evidence concerning Defendant's treatment of male employees, and Plaintiff makes no argument that her male co-worker was treated more favorably than she was. To the extent that Plaintiff offers comparators, she points only to a prior non-pregnant female employee who Plaintiff alleges was issued a PIP only after consultation with Human Resources. Pl.'s Statement of Undisputed Facts ¶ 52. Absent more, Defendant's motion for summary judgment on Plaintiff's sex discrimination claims must be granted.

## IV. CONCLUSION

Because Plaintiff has failed to make out a *prima facie* case of sex discrimination and failed to set forth evidence that Defendant's nondiscriminatory reason for her termination was pretext for pregnancy discrimination, Defendant's motion for summary judgment shall be granted in all respects.

Dated: January 21, 2016

                **BY THE COURT:**

                **/S/WENDY BEETLESTONE, J.**

                _____

                **WENDY BEETLESTONE, J.**